Mr. Kelly, whenever you're ready. Good morning, thank you for the support. I represent the CLAMATH CLAIMS COMMITTEE with respect to my associate Benjamin Senner. In 2009, the Claims Committee commenced an action in the Court of Federal Claims seeking compensation for the taking by destruction of certain irrigation facilities. The property interest in those facilities was established by the Clamath Termination Act. In two separate opinions, the CFC ruled that the Clamath Indian Tribes was a necessary indispensable party to the action that could not be joined in equitation of conscience and dismissed the action. Based on those rulings, the Court of Federal Claims also denied the Committee's motion to amend the complaint to include claims related to the taking and mismanagement of certain funds that were established by the final enrollees for use of the final enrollees under the Clamath Termination Act and the Clamath Judgment Fund Distribution Act. The United States and the Committee agreed that the CFC's denial of the motion to amend his move was an abuse of discretion. Where we differ, however, is that the United States takes the position that this Court can uphold that denial on alternative grounds whereas we take the position that it should be reversed and that the amendments should be granted. Just to be clear, I was a little confused in the briefing. With respect to the original claims, have you all abandoned an appeal of the CFC's determination that there was an indispensable party and therefore you're out? We abandoned the claims related to the distribution of certain monies under Section 13 of the Clamath Termination Act. The CFC held that those were told by the statute of limitations. They should have been brought as of 1961, I believe, and so we abandoned those claims. But what about the, I call them, the damn claims?  No, we haven't. Well, in your brief, you seem to acknowledge repeatedly that you can't, the KCC can't bring claims related to tribal interests for harms arising after 1986. I think that's what you say in numerous places. And if that's the case, I mean, the damn was, that was all after the turn of the century, right? That's right. How do you reconcile saying you have a right to bring those claims when you yourselves have conceded you can't bring claims that arose after 1986? We may not. To the extent that any of those claims also involve the management of trust assets, then these statute of limitations may have been waived by the Indian Tribal Accounting Section. But I thought the trust assets, the mismanagement claims, were part of the amendment group, not part of the original damn claims. Am I wrong about that? Specifically with respect to the litigation trust fund, yes, that is correct. Okay. So if that were the case, then yes. And those would also be beyond the statute of limitations. That's what this court would define. Before addressing the discriminations of the CFC with respect to the indispensability and the amendment, I think it's important to address an issue that, an ambiguity that was central to the decisions of the CFC and also to the arguments of the United States and the amicus. And that goes to the status of the committee with respect to the tribe. Both the United States and the amicus have argued that the tribe, effectively the tribe is the tribe is the tribe for all times and for all purposes, and have said that the committee is attempting to usurp tribal rights or otherwise impinge on the tribe's sovereignty. The tribe's recognized status was terminated by the Termination Act of 1954. Can I just interrupt? I take it that to some extent on both sides, there's an effort to get a merits ruling about the meaning and application of this series of statutes to the tribes on the one hand, to the KCC on the other hand, and that the core of the CFC's Rule 19 ruling was that there are non-trivial, substantial disputes about those issues, which if decided would adversely affect someone who's not here, and might, if decided without the presence of that somebody, expose the government to the risk of multiple liability. We don't have to decide, and it seems to me we basically should not decide, that once the threshold of substantiality of those disputes about the statutes is reached, what the answer to the dispute is. That's the whole point of Rule 19 saying don't adjudicate that. But Rule 19, the way the CFC looked at it, was predicated on a claim of interest by the tribe. It purported a claim of interest as well, because the tribe never articulated any specific interest at all in responding to the court's invitation to intervene. It simply said, yes, we claim a general interest in this litigation, and we think our interests will be affected by a judgment. What the Court of Federal Claims failed to do was to examine the nature of the committee's claims, and that is what this court said should be done in its united couture decision. And that's because the claim of interest has to relate to the subject of the action. Therefore, the analysis must begin with the subject of the action before it then looks to the claim of substantiality. I guess I took it from the CFC that the CFC thought the amended claims are litigation fund claims, and the CFC didn't really talk about them, so put those aside for a minute. The other claims are claims for compensation for loss of water rights and maybe fishing rights, I don't remember, from the removal of the dam. And putting aside what Judge Prost asked about, about your statement in the brief that any harm caused after 1986 you can't sue for, putting that aside, I thought the CFC's point was your client says some of that compensation really should go to us and the people we represent. I use that term loosely. And the tribes have indicated that they think that if there was damage from the removal of the dam to those water or fishing rights, that the tribes should get some of that compensation. And they're competing claims about at least some significant portion of the same pot of money. Isn't that a classic instance where Rule 19 fairly applies? It would be if it applied in this instance. Because it didn't examine the statutory scheme, the three climate acts, it didn't look at the various temporal periods in which the various rights arise or don't arise. And that was one of the issues that we pointed out in our briefing was that the rights of the committee representing the final enrollees, that is those 2,133 members who enrolled at termination, their rights existed between 1961 and at least 1986. And those rights are separate and distinct from any rights that the restored tribal government as the restored tribal government might also have. And so there is no overlap. The United States and Amicus have argued effectively that we are going to the substance of the tribes' rights. We are not. Our position is that we are going to the substance of the final enrollees under the statute and that those rights are necessarily exclusive of anybody else's rights. And if they're exclusive of anybody else's rights, then it's not the classic case of two people. I think the Amicus of the United States characterized it as competing claims to a common fund. That is not the issue here. Now, I will concede that it becomes tricky with respect to hunting and fishing rights. And that's because during the termination era, we have a number of decisions, Kimball and Callahan, for example, and Adair, for example, in which it was determined that the final enrollees have hunting and fishing rights under the treaty that exists after termination. We also have language in the Restoration Act that says all existing property rights will be maintained. And so there's a question about whether the final enrollees, if they're not enrolled in the current tribe, which is an open question, can exercise those rights after 1986 and whether that conflicts with the rights of the tribe. In that situation, I would agree that we might have competing claims to a common right, a common treaty right. Absolutely. Certainly this isn't the case with respect to the litigation trust fund, which was the subject of the amended complaint. Well, how about the dam claims, though? Why aren't those potentially competing claims? You used to guess, well, it's because each side has a particular amount of prospective damages but isn't deciding how much each side gets, that's the tricky question on which you need input from all. I would agree it's a tricky question. I don't know that I would agree with you. On which neither side has a frivolous position, which is what makes it tricky. I agree as to the water rights, absolutely, because those are treaty rights and because both sides have treaty rights. And that would encompass the takings and the two dam claims. The dam claims, I agree. So we're really only left with the litigation fund claims, right? The other claims, that seemed to be the thrust of your, particularly your reply, focusing on the litigation. The litigation fund, it's quite clear that that fund was established from assets of the final enrollees, vested rights of the final enrollees, for use by the final enrollees in prosecuting expressly tribal claims. This is an issue, again, that goes to the ambiguity. Because we call them tribal claims, the United States and Indonesia have asserted that that means the restored tribe. That is not the case. And it's easy to see that if you look at the context within which the Termination Act and the Judgment Fund Distribution Act were enacted. Just so that I'm clear, I think you just confirmed, but the United States and the tribes contest your interpretation of what the statutes do about that litigation fund. No, because they don't actually address the statutes at all in their briefs. The United States brief does not really address our arguments related to what the meaning and the impact of the statutes are. Instead, they simply assert that these are tribal rights on the assumption that an unrecognized tribe holds federal rights and can dispose of federal property rights that Congress has given to somebody else. What is the status of the litigation fund now? My understanding is that it is still held by the United States as trustee, that the United States has indicated that it is the subject of the related action in the district court in Jersey City. That's Pierce-Nez... Nez Perce. Nez Perce, right. Yes, sir. Have you intervened in that? We have. We filed a motion to intervene on that, and that's pending. And the motion is still pending. Yes, it is. And is that a forum in which the dispute between you and the tribes can and will be decided? We would prefer to have it decided in this forum. That is our preference. We move to intervene there and ask for an injunction to preserve certain records so that we can use those records in our action here. This is our forum of choice. The United States has indicated in its papers here and below that the litigation trust fund holds it for the tribe. It has denied the committee access to the fund for use in paying the cost of this litigation, and it has been providing the tribe with accounting statements as well. It has never done that to the committee, so far as I am aware. Can I just quickly ask a question that probably is not critical to the disposition of this case, but it's sort of looming out there, and I want to see what the answer is. There is this water rights adjudication proceeding that's ongoing. I take it out in Oregon with respect to, and I take it that the tribes and some of the local landowners and so forth are all parties to this, perhaps the state as well. What's the status of that, number one? And number two, does that have any implications for this case, for the dam part of this case, the water rights part of this case? My understanding is that a preliminary decision determination was reached in March, and that a final hearing on that determination will be held in March of next year. We do not represent the committee in that action. Is the committee involved in the action? Final enrollees are. Right, okay. Final enrollees are as landowners within the region, in fact, as Indian-Alatis or as successors to a lot of interests. And is that a forward-looking only proceeding? First of all, what forum has this Oregon? My understanding is it's in state court. It's a state procedure. And is it forward-looking only, or does it involve adjudication of retrospective compensation for water rights that may have… It is a determination of water rights to the various parties. It is retrospective to the extent that they look back to the rights of various individuals under priority. So they would be making a declaration that particular parties either did or didn't have any rights historically. Correct, including the tribe and the United States. Okay. Thank you. You've run into your rebuttal time, but we'll restore your three minutes. Thank you. And now we'll hear from Ms. Hazard. Yes, good morning. You begin, and you're giving Ms. McCoy a couple minutes at the end, right? Yes, I am. Good morning. May you please support? I'm Catherine Hazard here on behalf of the United States. I wanted to first address the issue that you raised, Judge Probst, about the temporal overlap question and the statements in the reply brief. As we understand the reply brief and as I understand the statements at argument here, the appellants are claiming that they have rights, water rights, that go up only to 1986. That was not our understanding when we responded to the opening brief. If it had been, we would have addressed the statute of limitations, which we think is a jurisdictional bar to those claims. In addition to the statute of limitations infirmity, there also would be no injury because the only injury to water rights that they claim is from a dam that was removed in 2008, and if they claim that they only hold interest up to 1986, then they haven't alleged any injury to those claims, and so it would be barred on standing grounds also. Can we move to the amended claims now? Now, as your friend points out, both you and he agree that the Court of Federal Claims erred in dismissing those claims as moot, and I appreciate you give us the whole menu of alternatives from which to pick from to decide that issue here. Sometimes that's helpful. Sometimes it's a little confusing. I know we've got different kinds of claims. We've got the payout claims. We've got the litigation claims. Is it the government's view that 19b could be used to dismiss all of the amended claims on that basis, that there's an indispensable property? Yes. Okay. Yes. And not only could be used, but essentially has to be used so that we can exercise the discretion that the CFC, any trial court has with respect to the Lincoln? It certainly, yes. It would need to be. There's no discretion left to be exercised. It would be an abuse of discretion not to dismiss on that ground. That's our position, yes. There are also timeliness problems with the late filing, which would be another basis if the court chose to address it on that ground, an equally legitimate ground for dismissing this. That's a little tougher, isn't it, given that we, I mean, as Judge Toronto pointed out, if we're going to decide it here rather than remand it to the trial judge, then we have to conclude if he had just gone the other way, we would consider it an abuse of discretion on his part, right? Right. There's some give on the timeliness stuff, isn't there, of futility and that sort of thing? Well, I guess that's where in our brief we parsed the different kinds of claims brought. The litigation fund claims that don't involve payment of the attorney's fees, the ones that concern the accounting and the mismanagement, those two claims. As the appellant can see, the government has never sent accounting statements to KCC. It has always sent them to the tribe. It has always dealt with the tribe in determining how, in making management decisions about how to manage the fund. So given that these claims were filed in 2009 to wait until 2012 and to argue that the trigger for bringing these claims is the denial of fees, there's just a complete disjuncture there in their argument. But ordinarily, that's the kind of consideration that would go into the district court's exercise of discretion. Yeah, it ordinarily does. I mean, this court in Tammawoc and in another case. Sometimes we say things are so clear that you wouldn't possibly decide anything. Right. Can I ask you a different question? The tribes don't have sovereign immunity against suit by the United States, right? That's right. So could the United States have brought the tribes into this proceeding? If we had a cross- I'm sorry. No, I know there's no interpleader rule in the CFC for reasons having something to do with sovereign immunity, but the note to it says, well, this could all be done under the interpleader rule, Rule 14. But just back to the question. Could the United States have brought the tribes into this proceeding? If we had a cross-claim against them, then we could bring them in, but I don't- Could you have filed, I guess what would amount to a declaratory judgment action that said there's this dispute about some significant part of the same pot of money, which is the whole basis here for the Rule 19 dismissal. It really ought to- It can't be decided without them. We can bring them in, so- But they don't- Yeah. They wouldn't be able to assert immunity against you. They would not. No. And if you could have brought them in, doesn't that weaken that part, which I realize is not the entirety, but that part of the Rule 19 analysis that worries about whether the government is exposed to multiple liability? Because if you could have brought them in, really, it's your own fault. That's the thought. Well, yeah. The sovereign immunity, I think, is a serious issue in Rule 19. It often will bar claims. And you look at Indian law and application of Rule 19, it often bars people access to having their claims adjudicated. I mean, I would set aside here the whole water rights issues because they're infirm on other grounds, but maybe we should discuss it in the context of the litigation fund. Or are you just asking me more academically? I would say that at least as to the litigation fund, I thought that essentially for the same reasons that the CFC gave in relying on Rule 19 for the original claims, it seems like the same competition over a single pot of money on non-frivolous grounds on both sides ought to lead to the same conclusion under Rule 19. So it does seem to me that the merits of the Rule 19 analysis are at issue, at least as to the amended claims. And at least one of the two interests under Rule 19 has to do with protecting the government, the United States, against exposure to multiple liability. And that's where then I come to wonder, isn't that a problem of your own making by your not bringing the tribes into the case? Well, yeah. I guess I would say no, it's not a problem of our own making. It's the tribe's right to assert sovereign immunity. It's the tribe's... Not against you. No, not against us. But we are not bringing a claim against anybody, and we don't have a claim against the tribe. I mean, what would our claim be? How could we force them to come in? We would say, should you speculatively decide that you think there are water rights that are harmed by removal of a dam, which we removed in order to enhance fish habitat, should you decide to bring a claim? We are going to bring you in just to prevent that. I mean, we don't bring actions like that. But it's the real potential for that claim that underlies the invocation of Rule 19 here. It is. And is that not enough? I mean, it's an open-ended question about whether essentially a declaratory relief claim could have been asserted by you to bring them in because you, in your own Rule 19 paper, said the tribes have given enough indication of a claim on this pot of money that they really need to be here before we can answer the legal questions. Right. Yeah. I think that's a very interesting question. It's not one that I've seen addressed in any of the Rule 19 cases I've read. So all I can do is say that we haven't done that, we don't do that, other courts seem not to have been troubled by that in doing their Rule 19 analysis. And the Supreme Court likewise didn't raise that. Maybe we couldn't do that against a foreign sovereign, but certainly could against a tribe. Could I ask you to address the question with respect to the litigation trust fund? The argument that your opposing counsel makes in the brief that both the Department of the Interior and the tribes have characterized the fund as not being a tribal asset. And I call your attention, I'm sure you're familiar with these pages of the joint attendance, but A704, which is the 2009 letter from the Department of the Interior, and A728, which is the letter from the tribes. Right. Yeah. I can see that the structure of how this works is a little bit confusing. Yeah, why don't you set us straight. I'll give you my best. I'll do as much as I can. To me at least. Yeah. That the fund was created out of tribal funds and that the government has managed it for the tribe. When you say out of tribal funds, it was created after 54, right? I thought the fund was actually funded initially in 58, right? Yeah. So that was after termination. Well, termination came after the act. Before the actual dissolution of the tribe, which occurred in the early 60s. 61, right. Okay. So there are still tribal funds, even though there's no tribes. I mean, there and we really disagree with you. Okay, good. Help me here. Okay. We believe that there has been a tribe all along. It has not. It lost its federally recognized status for the period between 1961 and 1986. But both the 1954 Act and the 1986 Act recognized that there still would be a tribe and it would still have a government. We just terminated provision of federal services to that tribe. So those funds were tribal funds in every sense of the word, regardless of whether you characterize the tribe as a federally sanctioned entity or not, right? Exactly. The initial funds. And that includes 1958 and also the later infusion in the mid-60s? Well, in the mid-60s, it gets a little bit more complicated. Oh, good. Yeah. This is what you need. In the mid-60s, because there were withdrawn members of the tribe, to say the 54 enrollees encompasses both the withdrawn members of the tribe and the members of the tribe who chose to stay with the tribe. So the 1,660 or whatever and the others. Right. So they won a judgment against the United States involving the value of property. And that judgment was paid in the 1960s to the Klamath, which would include the withdrawn members and the members who stayed with the tribe. So it included both. The entire 2,000 and the change. Yeah. And possibly, and I have to confess that I don't actually know this, whether the funds also would have gone to people who weren't on the 1954 enrollees but might have been bored. Yeah. Right. Exactly. Okay. Right. But certainly at the beginning, it was tribal funds. Only tribal funds. And so there is a conflict. So how do we get to the point in 2009 that the tribe says they aren't and the Department of the Interior says they aren't tribal funds? That's where I'm struggling. It's not that they're not tribal funds. It's who gets the benefit of them. Who are the beneficiaries? And the tribe agrees that the beneficiaries of this litigation fund are the 1954 enrollees and their heirs. But I guess this gets to two points that I want to make sure and get to before I sit down. And one is that the first new claim that they seek to bring involves a payment of attorney fees. And we read that as really challenging BIA's action or inaction. It's not really a takings claim. What they want is they want the government to pay them without requiring approval of the tribe. That's all the government's done. It's not that we will never under any grounds pay on this basis. It's just that we need the tribe to speak to it. The second concern that I want to make sure that I mention is that the majority of the tribe has created a final enrollee committee. And they have voted by a vast majority to have the litigation fund dispensed to them or disbursed to them pro rata rather than have it paid to their attorneys. So in a sense... Has that already been done? Has that already occurred? It has not occurred. But again, there is a process so that the BIA would have to approve that payment, the pro rata payment or the payment to the attorney fees. The way we view that is that's a challenge to an agency action or inaction, not a claim for a taking. I mean, should the fund be dispensed this way or that way? Okay. You're saying that's an APA claim that should be brought in district court. Right. Not an action that should be in the court of federal claims. And through an administrative appeals process, there's a record. Okay. If the court doesn't have any further questions. Thank you very much. Briefly from Ms. McCoy. Thank you, Your Honors. May it please the court. Amicus Curiae of Klamath Tribes is a sovereign and is a federally recognized American Indian tribe. And this case is about claims to the tribe's rights that are being asserted, one, without authority and, two, without the tribes. And I want to make sure that Your Honors understand because I think it gets to both the issues that were raised before about bringing the tribes in. Bringing the tribes into this case may resolve the without the tribes, but it's not going to resolve the number one, the without authority. We have a plaintiff here that has Why wouldn't that issue, namely their authority, be litigated once you were in the proceeding? Because there's absolutely not even a colorable claim that they have authority. Then the litigation would be very simple, wouldn't it? The plaintiff here cannot. The Court of Federal Claims, Judge Allegra, specifically asked the plaintiff here to provide evidence of any authority to assert the claims that it is asserting. And the plaintiff here could not do that and cannot do that. So you're right, it would end very quickly. It has already. I didn't say it would. I said on your assumption it would. But we don't have a ruling to review about their lack of authority, whether the KCC's lack of authority. We just have the Rule 19 ruling plus the mootness point about the amended complaint. That's correct. And that kicks in because, again, to the extent there's any competing claims over the trust property at issue here, it is important that the tribes are the sovereign. And that's what, as Your Honor pointed out, kicks in the Rule 19 analysis, that that's what Rule 19 doctrines of sovereign immunity, as the United States has briefed, are intended and have been interpreted to foreclose these kinds of claims. Can I ask you about the Nez Perce District of Columbia action? Is that a proceeding in which all or some of the competing claims that are at issue in this case, both the ones in the original complaint and the ones that they proposed to add by amendment, would be resolved? Not the merits of the complaint, but as between the tribes and the KCC, who was entitled to whatever claims there are against the government? First, I want to make clear that there is, of course, a confidentiality agreement and protective order that prohibits me from discussing anything. The Nez Perce claims are in settlement, so I want to make clear that I'm cognizant of the confidentiality agreement and protective order. I don't think that the issue there, the plaintiff here is the same plaintiff that's moved to intervene in the Nez Perce case. You say you don't think? No, it is. I'm sorry, I changed my course. You're right, it came out in an ineffective way there. They are the same plaintiff, and their motion to intervene, as was said, remains pending since it was raised there nine months ago. From the tribe's perspective, resolution if there is any issue of competition, again, raises the twin issues. One is that we think there are serious defects in the plaintiff. This group of individuals saying it is a claims committee and then taking the leap to assert any rights of the 1954 final enrollees. Understood that the 1954 final enrollees may have, at some point, had an interest in, as the United States says, matters of distribution and relating to the one litigation fund account. But it's clear from the overall scheme of federal law and from the tribe's law that the tribes nevertheless control the tribe's accounts. And within the tribe's sovereignty, they set up committees, as they have recently done, a final enrollees committee, to deal with those issues that relate to distribution. But none of that rises to the level of a competing claim over the ownership of those. Those are the tribe's funds and trust assets. So in the Nez Perce case, it's a very tangential side issue since the tribes there are seeking an accounting of... that the United States has held. And there's no issues about the next layer of if there's any recovery, settlement, or judgment in that case, how that recovery is distributed. Do I understand you to be saying then that these funds, the litigation trust funds, are a tribe... to have possession of and distribute them, but that the 1954 enrollees may be the people who have a right to that distribution effected through the tribal council? I think that's absolutely correct. And that is what you meant, I take it, in the letter on A728 when you said these aren't tribal assets, i.e. you couldn't use them for some other purpose, but nonetheless it's your determination as to how to distribute them among the 1954 enrollees. That's right, I think that's right, Your Honor. It's almost like a sub-beneficiary category. The tribes are the primary beneficiary, but then there's another level of... there's that level of control, and then there's a level of beneficiaries at the distribution level. And I think that's all... that's the limited role that the 1954 final enrollees, all of whom, by tribal law, and Congress said this was okay in the Restoration Act, are now members of the tribe. So, again, there's a very limited role for the 1954 final enrollees. But I really want to make the distinction between the 1954 final enrollees. Whatever rights they have, this plaintiff is not authorized to present those. Thank you. Back to you, Mr. Kelly, and we'll give you five minutes. Thank you, it's going to be tricky to get it all in. The... I'm just trying to think of where to begin. The 1954 members committee that the tribe has created consists only of living members of the final enrollees. It excludes the heirs and legatees whose rights are preserved under the distribution act. So, while it may be true that the committee, my client, does not represent the committee established by the tribe under the tribe's constitution, its claim is brought on behalf of all that statutory class of individuals whose rights were created by Congress. Now, as to those rights that Congress created, ask yourself this, what would have happened if the tribe had never been restored? If the Climate Restoration Act had never been passed, what would become of all the litigation funds and all the other assets that Congress said the final enrollees could have? They wouldn't have just disappeared. And by virtue of the Restoration Act, they didn't just magically transfer it to the tribe. If they did, there's a takings claim there, perhaps. Our argument is that those rights were preserved. I don't even know if this question makes sense, but between 1961 and 1986, was Interior producing reports of the fund and sending them to the tribe, even though the tribal government at that point was not federally recognized in some important sense? Not that I'm aware of. Not that I know of. And I have not seen any of the historical accounting records that Interior has been producing in connection with the tribal trust fund cases, so I don't know. Well, were they sending them, such records, to anyone at that point? I don't know. Oh, yeah, okay. So, all right. In terms of they were keeping accounting records, whether they were actually sending them out, I'm not aware, and I couldn't say. Okay, all right. Excuse me. This is not a claim for attorney's fees. This is a claim for access to the litigation fund, which was created from tribal assets. And by the way, whether or not the fund was created before or after termination shouldn't make a difference if the Termination Act was effective in transferring interest in all tribal property to the final enrollees. It still ended up being an asset of the final enrollees, and that is what the Climate Judgment Fund Distribution Act confirms, because it says quite explicitly that once all the litigation against the United States is finished, and Congress anticipated a day when there would be no claims and no more claimants, this is before the Restoration Act, it provided that any remaining funds, monies held by treasurer in the name of the Klamath Tribes would be distributed to those persons I'm calling the final enrollees and their heirs and legatees. Now, those property rights couldn't just disappear by virtue of the tribe being restored. And that is our point, is that with respect to the 19b issue, in the context of the amended claim, the analysis has to begin with the substance of the claim, the subject matter of the action, and that requires looking at the statute. That is what this court taught in United to Tuit, and it did it for a good reason, because here we have a plaintiff seeking to enforce rights it already has. It's not seeking to challenge anybody else's rights. We don't make any claims or any pretense to stand up in the shoes of the tribe or to assert the recognized restore tribes claim. Now, as I understand Ms. McCoy's point, she was saying the final enrollees are the people who have rights in this fund. How does that group differ from the group that you say has rights in this fund? As groups, legally they're identical because it's the same interest tolls. So what we're really arguing about is who gets to represent those two groups. No, we're arguing about who gets to dispose of rights that Congress created and assigned to a particular statutory class of individuals. Our point is that the United States doesn't have that right, so it's not for the United States to say, hey, this fund belongs to the tribe, nor is it for the tribe to say, we're going to dispose of litigation trust fund as we see fit. We're going to pass a resolution and distribute it, and we're only going to distribute to living final enrollees. We're just going to cut out the heirs and legatees of the deceased final enrollees. That means there's a taking of property that Congress set aside for those people and preserved in the Restoration Act. Do you have any even ballpark numerical figures? It's what, 60 years almost since 1954? That's right. As comparing numbers of living final enrollees with numbers of heirs and legatees? I don't at this point. I've tried to find that out, and I don't want to hazard a guess and have that in the record. I can't say, but my understanding is that in terms of the original final enrollees who are on that final tribal role, it is today less than half of the original 2,100 people, but I could be wrong. So again, there is a significant number of people because even if only half of them are alive, a half that is deceased, their interest goes by law as Congress intended to their heirs and legatees. If you accept the arguments of the United States, if you don't, if you accept the holding of the Court of Federal Claims on the amended claims, those rights are just dispensed with, and we have nowhere else to go to seek recompense, in part because we don't have the money to fund litigation. My senior partners in my law firm like me very much, but sometimes I try their patience when I work on this case. We charge our clients a fair hourly fee. We don't go for anything more than that, but there comes a certain point at which the final enrollees whose money is being taken away won't have recourse to the court simply because they don't have the money to get there, and that's all this is about. We are not seeking attorney's fees. We're seeking to have the United States recognize that it holds the litigation fund in trust for the final enrollees, and that it comply with the procedures set forth in the Judgment Fund Distribution Act for working with the Secretary to approve any funds that are withdrawn to pay litigation costs and to distribute any funds that are left over after the conclusion of any litigation. That's how the fund has been operated in the past, and oftentimes with the cooperation of the tribe. I can't explain why the tribe doesn't want to cooperate anymore. That's not for me to say, and it doesn't matter because these are federal rights that are vested in the final enrollees. Thank you.  Do you have a final point to make? No, I don't. Okay, thank you. We thank all the parties and the cases submitted.